Leonard WILLIAMS, Sr., etc., Plaintiff,

v.

**MICHELIN NORTH AMERICA, INC.,** Michelin Americas Research & Development Corporation, and Ford Motor Company, Defendants.

No. 604CV815ORL31DAB.

United States District Court, M.D. Florida, Orlando Division.

Aug. 9, 2005.

James Ryan Hubbard, Law Offices of James R. Hubbard, P.A., West Palm Beach, FL, Lydia Barrett, Richard Denney, Denney & Barrett, P.C., Norman, OK, Walter Landry Smith, Law Offices of Walter Landry Smith, Baton Rouge, LA, for Plaintiff.

Anna Burdeshaw Fretwell, Jennifer L. Kirk, R. Page Powell, Robert P. Monyak, Love, Willingham, Peters, Gilleland & Monyak, LLP, Clinton F. Fletcher, Richard K. Hines, V, Nelson, Mullins, Riley & Scarborough, L.L.P., Lawrence Hugh Kunin, Morris, Manning & Martin, Atlanta, GA, John Andrew DeVault, III, R.H. Farnell, II, Bedell, Dittmar, DeVault, Pillans & Coxe, P.A., Jacksonville, FL, Leah J. Zammit, Zammit Sudul, Marietta, GA, Edward C. Stewart, Wheeler, Trigg & Kennedy, P.C., Denver, CO, Francis M. McDonald, Jr., Sarah A. Long, Carlton Fields, P.A., Orlando, FL, Joseph H. Lang, Carlton Fields, P.A., Tampa, FL, Wendy Frank Lumish, Carlton Fields, P.A., Miami, FL, John Mark Thomas, Ford Motor Company, Dearborn, MI, William J. Conroy, Campbell, Campbell, Edwards & Conroy, P.C., Wayne, PA, for Defendants.

## ORDER

PRESNELL, District Judge.

This matter comes before the Court on a motion by the Defendants Michelin North America, Inc. and Michelin Americas Research and Development Corporation (collectively referred to as "Michelin") to exclude the testimony of the Plaintiff's expert, Dr. Alan Milner ("Dr.Milner"), (Doc. 105), and the Plaintiff's response thereto, (Doc. 114). The Court heard oral argument on June 27, 2005 (Doc. 129).[1]

## I. Introduction

This case arises out of an automobile accident in which Yvette Williams ("Williams") was killed. On February 8, 2002, Williams was driving her 1992 Ford Explorer on Interstate Highway 10, when her left rear tire, a P235/75R15 Uniroyal Laredo (the "Tire"), manufactured by Uniroyal in early 1992,[2] experienced a partial tread separation.[3] (Doc. 105, Att. 2 at 1–2).

The Plaintiff has identified Dr. Milner as an expert in failure analysis who will provide opinions and conclusions about the cause of the Tire's failure. (Doc. 114, Att. 2, Ex. A at 1). In accordance with Federal Rule of Civil Procedure 26, Plaintiff submitted Dr. Milner's expert report dated June 13, 2004 (Doc. 121–2), and he was deposed on September 8, 2004.[4] Michelin

now moves to exclude a portion of Dr. Milner's testimony, arguing that Dr. Milner does not have the necessary background and experience to testify on issues of tire design, manufacture or safety. (Doc. 105, Att. 2 at 3). The Court has carefully reviewed the pleadings, Dr. Milner's report and deposition, and the transcript of the *Daubert* hearing. The matter is ripe for determination.

## II. Dr. Milner

### A. Background

#### 1) Academic

Dr. Milner received a Bachelor's degree in 1957 from the University of Sheffield in the United Kingdom in the field of metallurgical engineering. (Doc. 114, Att. 2, App. A at 3). Metallurgical engineering is an applied science that is concerned with the application of physics, mechanical engineering, thermodynamics and chemistry to the manufacture of metals, the fabrication of metals into useful forms and products, and the evaluation and testing of those products. (*Id.* at 1–2). In recent years, because of technological developments in non-metallic and hybrid materials, the field has increasingly been referred to as "materials science and engineering." (*Id.* at 2). In earning his Bachelor's degree, Dr. Milner studied courses such as "Fabrication of Metal Products," "Mechanical Testing of Metals," "Failure Analysis of Metal Products and Structures,"[5] "Non-destruc-

---

1. In addition, Defendant filed supplemental authority (Doc. 122), to which Plaintiff responded (Doc. 125).

2. Michelin, as successor to Uniroyal, assumed responsibility for the manufacture of this tire.

3. The Tire had a temperature rating of "C," which is the lowest temperature rating allowable under federal regulations.

4. Dr. Milner supplemented his report on September 7, 2004, the day before his deposition (Doc. 105–3).

5. "Failure analysis is an established, systematic engineering methodology for the determination of the causes of product failure and the means of its prevention. It may be performed after an incident in which the product fails to perform as expected, particularly if the failure creates a hazardous situation. When failure analysis is conducted in relation to the development of a new product prototype, it is called predictive failure analysis and is sometimes referred to as Hazard Analysis or Failure Mode and Effect Analysis." (Doc. 114, Att. 2, App. A. at 2).

tive Testing," and "Metallographic Microscopy and Fractography." (*Id.* at 3).

Thereafter, Dr. Milner received a Master's degree in engineering from the University of London in 1962. (*Id.*). In earning that degree, he engaged in a research study of the "mechanical, design, fabrication, materials and environmental factors responsible for the catastrophic brittle failure of large steel structures . . . ." (*Id.*). He then earned a Ph.D. in Metallurgy and Materials from the University of Manchester in 1964, where he engaged in a research study "of the interfacial energy considerations governing the bonding of metals to oxides at elevated temperatures." (*Id.*). His education involved extensive training in fatigue failure, primarily in metals in composites. (Doc. 114, Att. 1, Ex. A at 4).

From 1970 to 1973, Dr. Milner was an associate professor of Metallurgical Engineering at the University of Arizona, where he taught both undergraduate and graduate students in classes relating to metal products fabrication, mechanical testing, failure analysis, and thermodynamics of processes and combustion. (Doc. 114, Att. 2, App. A at 5). In 1973, he was an associate professor at the University of Tennessee Space Institute, where he taught and supervised research in materials research on the mechanical properties of composite aerospace materials. (*Id.*).

*2) Experience*

From 1957 to 1958, Dr. Milner underwent post-graduate industrial engineer training at the Vickers Armstrong Aircraft Company. (*Id.* at 4). He took a machine shop and welding course, as well as an airliner airframe systems course, where he studied mechanical and hydraulic systems inspection testing and failure analysis. (*Id.*). He also participated in airliner manufacturing and assembly line operations, predictive failure analysis evaluation of new product structures and systems, and fatigue testing and mechanical evaluation of airframe components. (*Id.*). Dr. Milner then worked at General Electric Company in the United Kingdom from 1958 to 1961, in a variety of capacities, including: as a senior metallurgist researching and developing steel structures and pressure vessels for use in nuclear power plants; conducting predictive failure analyses for large-scale welded structures; conducting failure analyses of components from a collapsed crane; and evaluating the design of thermally-cycled mechanical bellows structures "involving stainless steel to mild steel welding joints." (*Id.*).

Dr. Milner also worked as a senior metallurgist and research specialist in the physical sciences labs at the Minnesota Mining and Manufacturing Company ("3M") from 1964 until 1970. (*Id.*). There he engaged in new products development research and acted as a consultant to various 3M operating divisions. (*Id.*). He also performed research and development for new methods of metal products fabrication for high performance aerospace materials. (*Id.*).

Dr. Milner is a professional engineer, and has been registered with the Arizona State Board of Technical Registration since 1973. (*Id.* at 1). Since 1974, he has worked full-time as an engineering consultant, specializing in failure analysis and accident investigation involving metallurgical, mechanical, automotive and combustion engineering. (*Id.*). His primary specialty is in tire and wheel systems failures. (Doc. 114, Att. 1, Ex. A at 1). He has forty years of experience in the area of products failure analysis, approximately thirty years of which has focused primarily on tire and wheel systems, including tire bead failure explosions, multi-piece tire and wheel system explosive separations, and the highway failure of steel belted

radial tires resulting from both tread separations and sidewall failures. (*Id.* at 1–2). He also works occasionally on other types of product failure analysis, generally involving automotive, aircraft or machine failures, malfunctions or servicing problems. (*Id.* at 2).

Dr. Milner's career has involved extensive work in the area of fatigue failure. For the past thirty years, his work in this area has focused primarily in rubber, because it is involved in steel belted radial tire failure, and in relation to fractures of steel wheel retaining fasteners. (*Id.* at 4). He has also been trained in non-destructive testing, including x-radiography, gamma radiation, microscopy, ultrasonics, and magnetic particle and dye penetrant testing. (*Id.* at 5).

Dr. Milner has never been involved in the design or the modification of the design of any tire, nor has he ever designed or developed an inner liner for a steel belted radial tire. (Doc. 105, Att. 5 at 98–99). Further, he has never worked in tire manufacturing, has never been employed in the tire industry, and has never taken a course in tire design. (Doc. 105, Att. 4 at 41). In forming his opinions as related to the design of the Tire, he relied on the "technology as expressed in the industry, the tire industry and the rubber industry and the steel industry literature, the technical literature that's available to [him]." (Doc. 105, Att. 5 at 98). Although he does not consider himself a chemical engineer, he has "extensive training in physical chemistry, organic chemistry and other branches of chemistry." (*Id.* at 99).

He also states that he is an "expert on the technological need for warnings and engineering methods but not necessarily on the way that they might best be expressed." (*Id.* at 100). He "identif[ies] what needs to be warned of or informed about but not necessarily the way that that

might be executed." (Doc. 105, Att. 5 at 100—Att. 6 at 1).

### 3) Past testimony

Dr. Milner has testified in many state and federal courts, and has given hundreds of depositions concerning the failure of tire and wheel systems over a period of approximately twenty-eight years. (Doc. 114, Att. 1, Ex. A at 5). He has never been disqualified from testifying in relation to the failure analysis of a tire or tire and wheel system. (*Id.*). During the time of the Firestone 500 failures in the late 1970s and the 1980 recall, he testified before Congress regarding the tread belt separation failure of steel belted radial tires. (*Id.*).

### B. Dr. Milner's Methods and Ultimate Opinion in the Instant Case

Dr. Milner undertook a number of tasks in arriving at his conclusions in this case. He examined physical evidence of the Tire, including the tire carcass, which is comprised of the two tire beads, the tubeless inner liner, the inner steel belt, and part of the tread / outer steel belt structure, as well as a thirty-one inch fragment of the separated and detached tread / outer steel belt. (Doc. 121, Att. 2 at 3). His examination of the Tire was conducted using the failure analysis methods of visual, tactile, fractographic, microscopic and x-radiographic (all non-destructive) procedures. (*Id.* at 4). He also compared the failure mode and separation characteristics of the Tire with other steel belted radial tires manufactured by Uniroyal and other manufacturers, which also failed by tread belt separation. (*Id.* at 5). He reviewed published technical literature on the mechanism of tread belt separation failures of steel belted radial tires and design countermeasures that are available to mitigate such failures. (*Id.*). Finally, he sectioned

several other Uniroyal Laredo tires, as well as other comparable tires, some of which employ tread belt separation countermeasures such as nylon belt edge strips or nylon cap plies. (*Id.; see also* Doc. 105, Att. 5 at 65, 73; Doc. 105, Att. 4 at 25 (together, noting that in arriving at his opinions, Dr. Milner: took measurements, took and viewed x-rays, performed a literature survey, performed "omega cuts," and reviewed case materials such as the Florida homicide report and other materials)).

Dr. Milner's ultimate opinion is that:

The failure started by separation at the sharp brass-free cut ends of the outer steel belt (which constitutes the belt edges). Separation progressed with the growth of fatigue cracks, which developed in the rubber materials between the inner and outer steel belt edges, under the influence of sheer strains induced by cyclic deformation of the Tire as it rotated in contact with the pavement. Accelerated belt edge separation then took place at several circumferential belt edge locations, at which zones of advanced separation developed. With continuing tire service, these areas of separation expanded across the Tire crown, weakening the rubber-steelcord composite structure of the Tire crown. The Tire then failed by peel-off of the tread and outer steel belt, primarily at the interface between the two steel belts, as a result of centrifugal forces induced by tire/wheel rotation at highway speed.

6. Dr. Milner's report, dated January 13, 2004, is entitled "Examination and Failure Analysis of a Uniroyal Laredo P235/75R15 Steel Belted Radial Tire that Failed Catastrophically by Tread/Belt Separation." (Doc. 121, Att.2). His description of the separation across the Tire crown is the description of the "classic failure mechanism," which is based on his years of tire examination of that process, but not necessarily based on a particular descrip-

(Doc. 121, Att. 2 at 18).[6] Dr. Milner opines that all steel belted tires are inherently prone to tread separation, unless so-called "countermeasures" are employed. (Doc. 105, Att. 4 at 39). Two such countermeasures are the subject of Michelin's Motion.

### III. Challenged Opinions and Michelin's Assertions

Michelin's basic argument is that Dr. Milner does not have the necessary background and experience to testify on issues of tire design, manufacture or failure, and that his testimony does not meet the reliability standards required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). (Doc. 105 at 3). First, Michelin argues that an expert in this sort of case must have specific expertise in tire design and manufacturing, because general expertise or knowledge are not sufficient. (*Id.* at 8). Michelin points out that Dr. Milner lacks this specific expertise because he has never worked in the tire industry, whether in manufacturing or designing tires, he is not a chemist or a chemical engineer, and he has never published his purported expertise to experts in the field. (*Id.* at 8–10).

Second, Michelin argues that even if Dr. Milner has the requisite background and expertise to render an opinion, those opinions are not based on a reliable foundation. (*Id.* at 11). Specifically, Michelin challenges four of Dr. Milner's opinions, which can be analyzed in two groups: countermeasures and expiry warnings.

tion of the subject Tire. (Doc. 105, Att. 5 at 88–89). However, Dr. Milner also states that the Tire has "fractographic features" that support these statements. (*Id.* at 89; *see also* Doc. 121, Att. 2 at 6, 7). The remaining portion of Dr. Milner's conclusion in this regard also describes the classic features of tread belt separation, which was confirmed in this case by Dr. Milner's physical observations of the Tire. (Doc. 105, Att. 5 at 89–90).

A) Countermeasures

The "countermeasures" conclusions that Michelin challenges appear to arise from several of the numbered conclusions in Dr. Milner's report. Dr. Milner's "First Conclusion" is that:

The Tire does not employ nylon overlay cap ply treadbelt separation countermeasures, and it is unclear whether the belt edge construction includes inter-steel belt edge wedges of adequate proportions, suggesting that the Tire may be deficient in this respect.

(Doc. 121, Att. 2 at 17). This conclusion is based on several methods of observation. First, Dr. Milner states that viewing sections of the Tire reveals the existence of minimal wedging, and that there is some irregularity in the wedging. (Doc. 105, Att. 4 at 31–32). Second, x-ray examination of the Tire shows that the Tire's steel cord structure was irregular and had gross manufacturing defects, and that it has no belt edge step off in some places and variable and discontinuous belt edge step-offs in other places.[7] (*Id.* at 32, 53). In addition, he performed testing on the tire to demonstrate that the belt edge architecture was defective. (*Id.* at 54). Dr. Milner also compared the Tire to both Michelin and Goodyear tires of the same size, and found that the subject Tire is not comparable to either in terms of the belt edge wedges. (*Id.* at 32). Although the other tires were made in 1998 or 1999 (versus 1992 for the subject Tire), Dr. Milner believes that comparison is appropriate because these countermeasures have been available for over twenty years, and such a comparison "illustrates the failure to apply the technology, not the absence of it." (*Id.* at 33).

Dr. Milner does not have an opinion as to what the distance should be by way of belt edge buildup between the two belts on a tire (also known as "crown separation"). (Doc. 105, Att. 5 at 77–78). Instead, he determined that certain tires have different belt wedge thicknesses, which he deduced based on viewing cuts he makes in tires. (*Id.* at 78).

The next conclusion is Dr. Milner's "Eleventh Conclusion," which states that:

Inclusion of nylon cap ply / cap strips would most probably have allowed the Tire to complete its service tread wear life and be retired from service, rather than failing in service by tread belt separation. The Tire was not provided with a nylon cap ply or cap strips/belt edge separation countermeasures. The Tire was manufactured with Temperature C rating, which is the lowest temperature rating allowable under Federal regulations.

(Doc. 121, Att. 2 at 20). Dr. Milner states that Goodyear's patents reveal the fact that the use of nylon cap plies prevents tread belt separation as well as the ingress of moisture into the tire. (Doc. 105, Att. 5 at 43, 44). In addition, he states that "experience has proven it, and the whole of the technical literature supports that." (*Id.* at 47). Finally, he points to depositions of Bill Robinson to support his statement that the implementation of nylon cap plies on Goodyear tires prevented tread belt separation. (*Id.* at 48).[8]

The first opinion Michelin challenges is Dr. Milner's opinion that the Tire did not have proper nylon belt edge strips or nylon cap plies between the inner and outer belt edges, and was therefore defectively

---

**7.** Dr. Milner describes x-ray testing as "nondestructive testing." (Doc. 105, Att. 4 at 55).

**8.** Dr. Milner was not able to identify a tire manufacturer in the United States who in 1992 made a tire of the same specifications as the subject Tire with a nylon cap ply. (Doc. 105, Att. 4 at 37–38).

designed. (Doc. 105 at 12). Michelin argues that this opinion is not reliable because Dr. Milner has not done any testing of his own to determine if the lack of proper nylon belt edge strips or nylon cap plies makes a tire more or less defective, and because he has not published any scientific studies or articles concerning this theory and has not submitted this idea to the scientific community for peer review. (*Id.* at 12–13). The next opinion that Michelin challenges is the assertion that the Tire is defective because it lacks the necessary belt edge step-off between overlapping belts. (*Id.* at 13). Michelin argues that this opinion is unreliable because Dr. Milner has not performed testing to support his theory regarding the impact the lack of belt edge step-off would have on similar tires, did not test the subject Tire, and thus can only say that since the tire lacked a belt edge step-off, the Tire failed because of it. (*Id.*).[9]

### B) Expiry warnings

Dr. Milner's challenged "expiry warning" conclusion arises from two of his numbered conclusions. One is his "Second Conclusion," which states that the "Tire was ten years old when it failed. The date of manufacture was not marked on the Tire in a manner that would be meaningful to consumers, nor is an expiration date marked on the Tire." (Doc. 121, Att. 2 at 17–18). The other is his "Twelfth Conclusion," which states:

> Tire aging literature indicates that: (a) aging degradation of tires in use and in storage places severe demands on tread-belt separation resistance durability; and (b) there is an important safety need to limit the time period over which a tire may be used or stored. Thus, there is need for the date of manufacture as well as the period of time during which a tire may be safely used or stored for use to be marked on the tire in a manner meaningful to the consumer.

(Doc. 121, Att. 2 at 21).

Dr. Milner is also aware that there are no tire manufacturers in the United States that place expiration dates on their tires. (Doc. 105, Att. 5 at 79). Dr. Milner obtained his information pertaining to his Second Conclusion from the internet and "the Dewine piece," as well as from industry reporting. (*Id.* at 79–80). For his Twelfth Conclusion Dr. Milner relies on a large body of work consisting of literature he assembled over several decades, as well as materials that originated with the Strategic Safety Organization.[10] (Doc. 105, Att. 5 at 95; *see also* Doc. 105, Att. 4 at 66). In addition, based on a paper by Pirelli, Dr. Milner states that the "life span of the tire should be defined by the tread

---

**9.** In its Motion, Michelin also challenges Dr. Milner's opinion that the location of the polyester nylon cords of the tire carcass can be seen lying beneath the tire's innerliner, a phenomenon called "cord shadowing," and his idea that because cords can be seen underneath the innerliner, this indicates that the innerliner was not of the requisite thickness to prevent migration of oxygen and moisture to the steel wires of inner and outer belts (also known as "excessive intra-carcass pressurization"). (Doc. 105 at 13–14). Michelin argues that Dr. Milner has no foundation for his theory, has not conducted tests to determine if the thickness of the innerliner met proper specifications, and because he has not cited any tests, studies or scientific literature that support his hypothesis of cord shadowing. (*Id.* at 14–15). However, this issue was not addressed at oral argument, (*see* Doc. 129 at 56), and thus the Court will not rule on it here.

**10.** The Strategic Safety Organization (the "SSO") is an organization that performs documentary research on various aspects of safety. (Doc. 105, Att. 5 at 95). The SSO had performed a comprehensive literature search, part of which had been conducted in Europe about the issue of aging. (*Id.*).

wearing out, and it should have a margin of safety so that the tire is not compromised before the tire has worn out and been discarded, and this is an accepted principle." (Doc. 105, Att. 4 at 64).

Michelin challenges Dr. Milner's assertion that the Tire should have been accompanied with an expiration date to prevent its use in light of fact that it was 10 years old when the decedent purchased the vehicle on which the Tire was located. (*Id.* at 15). Michelin argues that Dr. Milner has no valid support for his theory, and is not an expert in either warnings or human factor analysis. (*Id.*).

## IV. *Daubert*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court set out the applicable standard for the admissibility of expert testimony under Federal Rule of Evidence 702[11] ("Rule 702").[12] The Court noted a two-part analysis for expert scientific testimony, finding that the trial court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. 2786. This determination, in turn, involves an "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786; *see also Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996) (court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."). In other words, the purpose of this gatekeeping inquiry is to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786.[13]

The trial court's reliability inquiry focuses "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. 2786; *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir.2005) ("The proposed testimony must derive from the scientific method; good grounds and appropriate validation must support it."). The *Daubert* Court offered four considerations that the trial court should consider when examining proffered expert testimony: (1) whether the theory or technique "can be (and has

---

**11.** Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

**12.** Although the Daubert opinion specifically addressed scientific evidence, the Supreme Court later acknowledged, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–48, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), that the reliability standard enunciated in Federal Rule of Evidence 702 applies "to all scientific, technical, or other specialized matters within its scope."

**13.** *See also Allison v. McGhan Medical Corp.*, 184 F.3d 1300 (11th Cir.1999):

> While scientific testimony need not be known to a certainty, *Daubert* does require that assertions be derived from "scientific knowledge." "Scientific" means proper grounding in the methods and procedures of science, or the "scientific method." "Knowledge" is more than subjective belief or unsupported speculation, but "applies to any body of known facts or to any body of ideas from such facts or accepted as truths on good grounds."

*Id.* at 1319 (*citing Daubert*, 509 U.S. at 589–90, 113 S.Ct. 2786).

been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the known or potential rate of error ... and the existence and maintenance of standards controlling the technique's operation;" and (4) "general acceptance" in a "relevant scientific community." *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). These factors are only a starting point for the court's analysis, and other factors may be considered where appropriate. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir.1999)

■ The proponent of the testimony thus does not have to establish that it is scientifically correct, "but that by a preponderance of the evidence, it is reliable." *Allison*, 184 F.3d at 1312; *see also McClain*, 401 F.3d at 1238 ("The court must consider the testimony with the understanding that the burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion.") (internal citation, quotation and punctuation omitted). The trial court's inquiry must be tied to the facts of a particular case, and thus "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony," and thus the *Daubert* factors may not all necessarily apply in each case. *Kumho*, 526 U.S. at 149–150, 119 S.Ct. 1167 (internal citation and quotation omitted).

■ Under the relevance prong of the analysis, the court "must ensure that the proposed expert testimony is relevant to the task at hand, ... i.e., that it logically advances a material aspect of the proposing party's case." *Allison*, 184 F.3d at 1312 (internal citation and quotation omitted). "Thus, the evidence must have a valid scientific connection to the disputed facts in the case." *Id.* Indeed, a trial court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

Ultimately, the trial court's inquiry is "whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Kumho*, 526 U.S. at 155, 119 S.Ct. 1167.[14]

## V. Legal Analysis

### A. *McDonald v. Cooper Tire & Rubber Co.*

The issue of Dr. Milner's ability to offer expert testimony was raised in *McDonald v. Cooper Tire & Rubber Co.*, Case No. 8:01–CV–1306–T–27TGW, a recent case in this District. There, Dr. Milner offered five conclusions, which the defense challenged, including conclusions regarding the manner in which the subject tire failed, that there was evidence of deficient adhesion, the subject tire either lacked or was manufactured with inadequate anti-degradants, that the use of nylon cap plies would probably have prevented the subject incident, and the use of belt edge wedges as a

---

**14.** *See also City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir.1998): Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Id.* at 562.

counter-measure would have delayed the belt edge separation in the subject tire. (*McDonald*, Doc. 255 at 1–2). After citing to *Riley v. Continental General Tire*, Case No. 1:00–CV–00369 (E.D.Tex.), a case in which Dr. Milner testified, the court found that

> Milner's metallurgical, engineering and materials science background is extensive and enables him to comprehend and draw conclusions concerning the relationship of steel and materials, including but not limited to rubber. The performance and failure of the steel belted radial at issue in this case will necessarily involve testimony concerning the structural integrity of such tires. As steel is the principle structural material in steel belted radial tires, Milner is qualified to render opinion testimony on the performance and failure of the tire at issue here.

(*Id.* at 6). The court then made three specific findings regarding the admissibility of Dr. Milner's testimony. In its first two findings, the court found admissible Dr. Milner's testimony regarding: (1) inadequate bonding or the lack of bonding in the subject tire;[15] and (2) the inclusion of antidegradants.[16] (*Id.* at 10–11).

In its third finding, however, the court found inadmissible Dr. Milner's opinions that the use of nylon cap plies would probably have prevented the subject incident, and that the use of a belt edge wedge could have delayed the belt edge separation. (*Id.* at 11–12). The court concluded that the proffered testimony concerning countermeasures related to the design of the subject tire, specifically the significance of the absence of countermeasures, not the manufacturing process. (*Id.* at 12). The court determined that although Dr. Milner relied on the opinions of tire industry experts, he personally had no training or education in either the design of steel belted radial tires or the effectiveness of countermeasures in preventing tread separation, and that his background and experience in metals science, engineering and metallurgy did not involve tire design. (*Id.*). Thus, the court concluded that Dr. Milner was "not qualified to testify concerning the design of the tire, including the use of countermeasures." (*Id.* at 13).[17]

15. The court addressed Dr. Milner's testimony that the subject tire's failure was caused by "poor bonding or no bonding," how such bonding could have been caused, and the evidence supporting that finding. (Doc. 255 at 8–9).

16. Regarding the anti-degradants, the court specifically addressed Dr. Milner's finding that "cracks in the tire were indicative of poor aging properties, which is due to the absence of or the inadequacy of the use of anti-degradants in the manufacture of the subject tire." (Doc. 255 at 10).

17. The court specifically stated:

> [Milner's] testimony concerning the absence of countermeasures relates to the design of the tire as opposed to the manufacturing process. Milner's background and experience in materials science, engineering and metallurgy does not involve tire design.... Milner seeks to testify about the significance of the *absence* of countermeasures. In the *Riley* case, Milner was qualified to testify that cap strips were improperly placed, the need for full cap plies and poor cap strip adhesion, all relating to the mechanics of the failure in that case. These matters were within Milner's expertise as an analyst of materials and their properties. Although it is understood and acknowledged that countermeasures can delay the progress of belt edge separations, Milner is not qualified to assert that opinion.... [A]lthough he is qualified to testify under *Daubert* concerning whether the tire materials have bonded and the effect of anti-degradants, he is not qualified to testify concerning the design of the tire, including the use of countermeasures.
> *McDonald*, Doc. 255 at 12–13 (internal citations omitted) (emphasis in original).

### B. Countermeasures

■ Judge Whittemore's analysis and well-reasoned opinion in *McDonald* is equally applicable here, and thus the Court adopts his analysis and conclusion. The effectiveness or necessity of various countermeasures in preventing tread separation is beyond the scope of Dr. Milner's expertise and his opinions in this regard will be excluded because they simply lack the scientific reliability required by *Daubert.* Specifically, Dr. Milner's conclusions that the Tire was defective because it did not employ nylon overlay cap plies, nylon belt edge strips, or adequate belt edge separation countermeasures will be excluded.

### C. Expiry Warnings

■ Tires oxidize and degrade over time. Thus, a tire's performance may be affected by age, independent of its actual in-service use. While the subject tire had minimum tread wear, it was 10 years old at the time of the accident.[18] Dr. Milner therefore suggests that there is need for disclosure of the date of manufacture as well as the period of time during which the tire may be safely used. (Doc. 121 at 21). However, he concedes that chemical countermeasures can extend tire life, (Doc. 105, Att. 4 at 65); he doesn't know what antidegradants were used in this tire, (*id.* at 75); and that it is up to each manufacturer to decide upon an appropriate expiration date for its tires, (*id.* at 64, 65, 70).[19]

■ Dr. Milner's generalized opinion in this regard lacks scientific support and is beyond the scope of his expertise. He is not an expert in either tire design or in human factors, he does not arrive at or base his conclusions on any sort of scienti-

fic method, and thus his opinion fails the reliability prong of *Daubert. See Shepherd v. Michelin Tire Corp.,* 6 F.Supp.2d 1307, 1310–12 (N.D.Ala.1997) (testimony of expert who studied, wrote about, and testified about the theory of human factors related to warnings, and who had written articles on the topic, but who conducted no testing to support his theoretical conclusions, and could only speculate as to whether use of proposed warning would have prevented accident, was not scientific and therefore not reliable). Moreover, his opinion does not fit the facts of this case, because he has done no study as to the appropriate expiration date for this particular tire, and thus his opinions in this regard lack a valid scientific connection to the facts of the case, and therefore also fail the relevance prong. Indeed, Dr. Milner's testimony regarding expiry warnings is exactly what the Court must guard against under *Daubert:* "unscientific speculation offered by a genuine scientist." *Rosen,* 78 F.3d at 318. Therefore, Dr. Milner will not be permitted to testify that "the date of manufacture was not marked on the Tire in a manner that would be meaningful to consumers," nor may he testify that "there is a need for the date of manufacture as well as the period of time during which a tire may be safely used or stored for use to be marked on the tire in a manner meaningful to the consumer."

## VI. Conclusion

Dr. Milner is a professional advocate, dressed in scientific garb. He has for many years made a living testifying on behalf of plaintiffs in products liability cases. While Dr. Milner is undoubtedly qualified to express opinions in the realm of metallurgy

---

**18.** The tire had likely been stored as a spare in the trunk of a vehicle.

**19.** There is ongoing debate in the tire design community concerning this subject. Al-

though a few companies in Europe now put expiration dates on their European tires, there is no such requirement in the United States.

and consequent tire failure analysis, he is not an expert in tire design and his opinions regarding necessary or effective countermeasures to prevent tread separation lack sufficient scientific foundation to withstand scrutiny under Rule 702. His opinions regarding expiration dates suffer the same deficiency. Therefore, it is

**ORDERED** that Defendants' Motion (Doc. 105) is GRANTED, and Dr. Milner's testimony will be limited accordingly.